# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DIONTE L. BREEDLOVE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:22-cv-00618** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Dionte Breedlove, a federal prisoner proceeding pro se, has filed a Motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence imposed in Criminal Case No. 3:18-cr-00253-1 (M.D. Tenn.). (Doc. No. 1) ("Petition"). Breedlove also filed several supplements to his Petition. (Doc. Nos. 5, 6, 7, 9, 11). Although the Court appointed the Federal Public Defender to represent Breedlove in this matter, (Doc. Nos. 12, 13), appointed counsel notified the Court that Breedlove decided to rely upon the arguments he raised in his initial pro se Petition. (Doc. No. 25).

The Government filed an opposition to Breedlove's Petition (Doc. No. 35), and this matter is now ripe for decision. For the following reasons, Breedlove's Motion will be denied.

## I.    BACKGROUND

Breedlove's criminal charges stemmed from two separate armed robberies of a Rite Aid Drug Store in Nashville, Tennessee, which he committed with the assistance of his co-defendant and Rite Aid employee Carlos Valcarcel-Arocho ("Arocho"). The first robbery occurred at around 1:40 a.m. on September 14, 2017, when Arocho was working as a cashier and Joseph Smelley was working as the store's manager. (Case No. 3:18-cr-00253-1 ("Crim."), Doc. No. 288 at 49–50). Smelley testified that "the robber came in, he told me to hit the floor," and he "pointed" a gun "at

me." (Crim. Doc. No. 289 at 68–69). Smelley could not see Breedlove's full face because he was wearing a bandana, but he did observe Breedlove's "eyes and his eyebrows." (Id. at 70–71, 139). Smelley complied with Breedlove's demands. Breedlove left the store with about $2,800.00. (Id. at 42). Smelley later provided a description of the suspect to police. (Id. at 171–75).

Having avoided detection, Breedlove (with Arocho's assistance) decided to rob the same Rite Aid store a second time. The second robbery occurred on October 9, 2017, at approximately 4:03 a.m. (Crim. Doc. No. 288 at 49). This time Nicholas Teal was working as the manager, Garion Bogard was working as an unarmed security guard, and Arocho was again working as the cashier. (Crim. Doc. No. 290 at 63). Breedlove entered the store brandishing a revolver and wearing a black bandana, black shoes, black pants, blue gloves, and a black blanket adorned with black hearts, X's, and O's. (Id. at 28, 182). He aimed his gun at Teal and Arocho and ordered them to take money out of the safe and put it in his bag. (Id. at 71–73). Then, before leaving the store, Breedlove shot Bogard in the chest at point blank range while he was on his knees and his hands were behind his head. (Id. at 24–26). Breedlove left the second robbery with approximately $2,400.00. (Crim. Doc. No. 289 at 42). Bogard survived the shooting and learned to walk again after receiving five separate emergency surgeries. (Crim. Doc. Nos. 290 at 31–32; 294 at 102).

The Government presented substantial eyewitness testimony connecting Breedlove to both robberies. Detective Jonathan McGowen testified that he was assigned to investigate the second robbery because it involved a shooting. (Crim. Doc. No. 290 at 152). McGowen reviewed the Rite Aid video surveillance footage and noticed that Arocho was sending text messages shortly before the second robbery. (Id. at 155–60). Arocho told Detective McGowen that he was texting with his friend "Dionte Johnson" who lived in Madison, Tennessee. (Crim. Doc. No. 291 at 208). Arocho later admitted that "Dionte Johnson" was a fake name he gave police "to basically throw

them off" from discovering that he was an accomplice. (Id. at 281; Crim. Doc. No. 290 at 146). Despite Arocho's intentions, this information allowed detectives to develop "Dionte Breedlove" as a person who met the description of the suspect.

Police then constructed a photographic lineup with Breedlove's image and showed it to Smelley and Bogard.[1] Smelley identified Breedlove in the photographic lineup by his distinctive "eyes and eyebrows" even though he wore a bandana during the robbery. (Crim. Doc. No. 289 at 70–71). Bogard similarly identified Breedlove in the lineup based on his eyes, and he testified that he "absolutely" recognized Breedlove as the person who shot him in the chest. (Crim. Doc. No. 290 at 40–42). These identifications allowed police to obtain arrest warrants and arrest Breedlove. (Id. at 118, 180 (noting that police also arrested Arocho)). Smelley, Bogard, Arocho, and several other witnesses also identified Breedlove in the courtroom as the person who committed the robberies. (Crim. Doc. Nos. 289 at 71; 290 at 40; 291 at 201).

In addition to eyewitness testimony, the Government presented physical evidence that tied Breedlove to the robberies. Police obtained this evidence when they executed a search warrant at Arocho's house. There, they found, among other things, a camouflage backpack containing a motel receipt with Breedlove's name on it, blue gloves, and a black blanket with black hearts, X's, and O's on it that matched the blanket used during the second robbery. (Crim. Doc. No. 290 at 182, 186–87). Arocho and his girlfriend Dianna Jones both testified at trial that Breedlove had been staying at their apartment and that the backpack belonged to him. (Id. at 28–30; see also Crim. Doc. No. 293 at 33). Police also seized Arocho's phone and presented at trial Arocho's communications with Breedlove in connection with both robberies. The first robbery had already

---

[1] The revised August 14, 2020 Presentence Investigation Report notes that Breedlove is a 5'8" African American male who was in his early twenties and weighed approximately 160 pounds at the time of the robberies. (Crim. Doc. No. 275 at 3).

been "planned out," so there were only a few communications between Arocho and a phone belonging to "Lil D" (Arocho's nickname for Breedlove) leading up to that robbery. (Crim. Doc. Nos. 291 at 203–04; 292 at 39–40). During the second robbery, Breedlove continuously communicated with Arocho using a different phone that belonged to his girlfriend Destiny Mooneyhan. (Id. at 269–70; see also Crim. Doc. No. 292 at 65). Arocho texted the Mooneyhan phone "come in now" approximately one minute before Breedlove entered the store for the second robbery. (Crim. Doc. No. 291 at 275–76). Detective Joseph Chadwick High substantiated this evidence by conducting a cell site location analysis showing that the Mooneyhan phone was near the Rite Aid at the time of the second robbery.[2] (Crim. Doc. Nos. 290 at 198; 291 at 20, 47–53).

The Government also played Breedlove's recorded jail calls in which he made incriminating statements connecting him to the robberies. (Crim. Doc. No. 292 at 85–98). In these calls, Breedlove expressed concerns about Mooneyhan coming into court and collecting the "15 bands," which Detective Keith Sutherland testified likely referred to Rite Aid's $15,000 "Crime Stoppers" reward for information leading to the arrest of the second robber. (Id. at 87–88; see also Crim. Doc. No. 289 at 36). He also told Mooneyhan he wanted "to make sure [Arocho] ain't snitching on me" because "my face was never seen" during the robberies. (Id. at 88–90, 98). Breedlove also stated during these calls that police did not find the "CD 38 Baby" (i.e. his gun) or the "coins" he stole from Rite Aid. (Id. at 91–95).

After a week-long trial, the jury convicted Breedlove of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One); two counts of substantive Hobbs Act robbery, in violation of 18 U.S.C. § 1951; (Counts Two and Four); and two counts of using or

---

[2] The Court granted Breedlove's request to add attorney John Morris to his trial team for the limited purpose of cross-examining Detective High. (See Crim. Doc. Nos. 164 at 11–12; 290 at 275).

brandishing a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts Three and Five). (Crim. Doc. No. 201; see also Crim. Doc. No. 51). On August 14, 2020, the Court sentenced Breedlove to a guideline sentence of 355 months of imprisonment, followed by five years of supervised release. (Crim. Doc. Nos. 270; 271).

Breedlove appealed his convictions and sentence on the grounds that the Court improperly excluded his proposed eyewitness-identification expert, the Court should have granted his motion for judgment of acquittal because there was insufficient evidence to support his convictions, and the Court's sentence was substantively unreasonable. (See Crim. Doc. No. 316). In affirming the Court's judgment, the United States Court of Appeals for the Sixth Circuit held that "Breedlove's convictions were supported by overwhelming corroborating evidence to the eyewitness identifications, such as the testimony of his accomplice, Valcarcel-Arocho, that they planned and conducted the robberies together and Breedlove's recorded phone calls from jail that strongly supported his guilt." (Id. at 6). The Sixth Circuit further found that Breedlove's within guideline sentence was substantively reasonable because the Court "considered the nature and circumstance of the offenses, in particular the fact that [Breedlove] shot an unarmed security guard during one of the robberies, his criminal history of multiple burglaries and another robbery involving a shooting, and the need to promote respect for the law, provide deterrence, and protect the public." (Id. at 8).

Breedlove has now filed a timely motion under 28 U.S.C. § 2255 seeking to vacate his convictions and sentence because of ineffective assistance of trial and appellate counsel, the Government engaged in prosecutorial misconduct, his § 924(c) convictions are invalid based on the Supreme Court's decision in United States v. Davis, 588 U.S. 445 (2009), his "exemplary" post-sentencing rehabilitation warrants some sort of relief, and the Court erred by imposing

mandatory consecutive sentences for his § 924(c) convictions. The Government opposes Breedlove's Motion in its entirety.

## II.    LEGAL STANDARD

Section 2255 authorizes a federal prisoner to "move the court which imposed [his] sentence to vacate, set aside or correct the sentence" on the grounds "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a). The Sixth Circuit clarified that "[a] petitioner seeking § 2255 relief must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid."[3] Gabrion v. United States, 43 F.4th 569, 578 (6th Cir. 2022) (citation omitted).

"To prevail on a § 2255 motion alleging constitutional error, the petitioner must establish an error of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings." Watson v. United States, 165 F.3d 486, 488 (6th Cir. 1999) (citing Brecht v. Abrahamson, 507 U.S. 619, 637–38 (1993)). "To prevail on a § 2255 motion alleging non-constitutional error, the petitioner must establish a fundamental effect which inherently results in a complete miscarriage of justice, or, an error so egregious that it amounts to a violation of due process." Id. (citing United States v. Ferguson, 918 F.2d 627, 630 (6th Cir. 1990)) (internal quotation marks omitted).

---

[3] A court considering a § 2255 petition must grant an evidentiary hearing unless the record "conclusively show[s] that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Breedlove did not request a hearing, and, for the reasons explained in this Memorandum Opinion, the Court has determined that a hearing is unnecessary because Breedlove plainly is not entitled to the relief he is requesting.

6

## III.    ANALYSIS

### A.    Ineffective Assistance of Trial Counsel

Breedlove first argues that his trial attorneys (Criminal Justice Act appointees William Shockley and Meggan Sullivan) did not provide reasonably effective assistance of counsel at trial. (See Doc. No. 1 at 4, 15–31). A petitioner's claim that his Sixth Amendment "right to the effective assistance of counsel was violated" is properly characterized as an alleged "error of constitutional magnitude," which is cognizable in a § 2255 proceeding. Pough v. United States, 442 F.3d 959, 964 (6th Cir. 2006); see also United States v. Doyle, 631 F.3d 815, 817 (6th Cir. 2011). The Court evaluates ineffective-assistance-of-counsel claims under the two-prong test established in Strickland v. Washington, 466 U.S. 668, 684 (1984). According to Strickland, the petitioner must establish that his counsel's performance was both: (1) deficient (i.e. that his "counsel's performance fell below an objective standard of reasonableness"), and (2) prejudicial (i.e. that "there is a reasonable probability that, but for the deficiency, the outcome of the proceedings would have been different"). Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003) (citing Strickland, 466 U.S. at 694).

For the "deficient performance" prong of the Strickland test, the petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland, 466 U.S. at 690. The Court then "determine[s] whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. The Court's "review of the lawyer's performance must be highly deferential, and indulge a strong presumption that a lawyer's conduct in discharging his duties falls within" the range of reasonableness because "reasonable lawyers may disagree on the appropriate strategy for defending a client." Bigelow v. Williams, 367 F.3d 562, 570 (6th Cir. 2004) (internal quotation marks omitted). Thus, a "strategic decision cannot be the basis for a

claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001).

For the "prejudice" prong of the Strickland test, the petitioner must meet the "high burden" of demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Monea v. United States, 914 F.3d 414, 419 (6th Cir. 2019) (quoting Davis v. Laffler, 658 F.3d 525, 536 (6th Cir. 2011)). A "reasonable probability" of prejudice means "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The petitioner must also provide "citation[s] to the record to support his conclusion[s]" because "[a]n allegation entirely unsupported by the record cannot meet the prejudice component of the Strickland inquiry." Ross v. United States, 339 F.3d 483, 494 (6th Cir. 2003).

"When deciding ineffective-assistance claims, courts need not address both" the deficient performance and prejudice "components of the inquiry 'if the defendant makes an insufficient showing on one.'" Campbell v. United States, 364 F.3d 727, 730 (6th Cir. 2004) (quoting Strickland, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim" based on "lack of sufficient prejudice," then the Court should do so. Strickland, 466 U.S. at 697. "Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." Id.

Here, Breedlove makes seven somewhat overlapping claims for why his trial counsel were ineffective: (1) counsel failed to question witnesses about Rite Aid's $15,000 Crime Stoppers reward; (2) counsel failed to investigate Breedlove's case or familiarize themselves with the relevant facts; (3) counsel breached their duty of loyalty by calling him "guilty" before the Court's

plea colloquy; (4) counsel failed to object to the Government's closing argument; (5) counsel did not cross-examine or impeach witnesses effectively; (6) counsel did not give an effective closing argument; and (7) counsel failed to present mitigating evidence at sentencing. (Doc. No. 1 at 15–37). Before addressing these claims in detail, the Court notes that Breedlove's Motion largely ignores Strickland's prejudice prong. That is, Breedlove repeatedly fails to explain how his counsel's alleged errors, if corrected, would have resulted in an acquittal or a lower sentence. Griffin, 330 F.3d at 736. This failure to show prejudice dooms most of Breedlove's claims from the outset. Id. Nevertheless, the Court has carefully considered Breedlove's claims to determine whether any of them satisfy *both* prongs of Strickland's two-prong test.

1. **Counsel's Alleged Failure to Interview or Ask Witnesses About Rite Aid's Cash Reward**

Breedlove claims that his lawyers were ineffective because they did not interview or question "key witnesses" before trial about their knowledge of Rite Aid's $15,000 "Crime Stopper" cash reward for information leading to the arrest of the person who committed the October 9, 2017 robbery. (Doc. No. 1 at 15; see also Crim. Doc. No. 289 at 35–37). Specifically, he contends that his "trial counsel failed to elicit that the possibility of $15,000 may have motivated Smelley to identify a suspect completely outside the scope of his initial description." (Doc. No. 1 at 24). He also suggests that his counsel could have used Arocho's knowledge of the reward as "impeachment evidence" to show that he "could have been motivated by the $15,000" when he implicated Breedlove in the robberies. (Id. at 29).

The Court does not find that counsel's approach to the $15,000 reward fell below "an objective standard of reasonableness" in light of "prevailing professional norms." See Strickland, 466 U.S. at 688. There are many reasons why counsel could have reasonably concluded, as a matter of trial strategy, that asking Smelley and Arocho about Rite Aid's reward would not have

helped Breedlove's case. Two obvious reasons are that Smelley or Arocho could have testified that they did not know about the Rite Aid reward, or that their knowledge of the reward had no effect on their testimony. To avoid this potentially unhelpful testimony, counsel waited until closing argument to suggest that the cash reward may have unduly influenced Smelley's identification testimony:

> Now, we've talked about the time that Mr. Smelley had to identify the September suspect. Moving forward to the time where Mr. Smelley actually identified Mr. Breedlove in the lineup. At this time, they had already started developing a theory. Law enforcement had already started working on their framework. Mr. Smelley testified that he had seen the news. *We also know that there was a Crime Stopper offering a reward that had gone public* and there was a lot of information flying around about the September and October robberies.

(Crim. Doc. No. 293 at 29 (emphases added)). Counsel also attacked Arocho's credibility generally and suggested that his testimony was "just not believable." (Id. at 34).

Assuming Breedlove is correct that his counsel never interviewed any Government witnesses about their knowledge of the reward, the Sixth Circuit has "held that the failure by counsel to either investigate or interview promising witnesses constitutes negligence, not trial strategy." Cathron v. Jones, 77 F. App'x 835, 841 (6th Cir. 2003). But even if his trial counsel acted negligently, Breedlove would still need to show that "the result of the proceeding would have been different," if his counsel had interviewed witnesses about their knowledge of the reward. Strickland, 466 U.S. at 694. Breedlove does not come close to making this showing because he has not established that the Crime Stopper reward did, in fact, motivate Smelley or Arocho to testify against him. Plus, even if the Crime Stopper reward created some possible bias in Smelley's and Arocho's testimony, that bias would need to be balanced against the "overwhelming corroborating evidence" of Breedlove's guilt, which the Sixth Circuit found included "the physical and cellphone evidence linking [Arocho] with Breedlove and . . . Breedlove's recorded jail phone

calls." (Crim. Doc. No. 316 at 6–7). As a result, Breedlove has not shown that the jury would have acquitted him if his counsel tried to impeach Smelley and Arocho with evidence of Rite Aid's $15,000 reward. Such an unsupported § 2255 claim cannot succeed under Strickland.

2.  **Counsel's Allegedly Inadequate Pre-Trial Investigation and General Lack of Familiarity With the Case**

Breedlove next argues that his counsel's inadequate investigation and general lack of familiarity with the case resulted in their failure to address eyewitness identification issues, challenge the validity of his arrest warrant, and challenge the warrantless seizure of certain cell phone location data. (Doc. No. 1 at 15–17). "There is no bright-line rule for determining whether an investigation was adequate." Smith v. United States, 617 F. Supp. 3d 828, 837 (M.D. Tenn. 2022). That said, a court will likely find that "the attorney adequately investigated his client's case" if he "interviewed his client, interviewed other witnesses, reviewed discovery, and pursued evidence to support a defense theory." Id.

a.  Counsel's Familiarity with Eyewitness Identification Issues

Breedlove claims that his trial lawyers were ineffective because they did not know enough about the case to highlight discrepancies regarding certain eyewitness identification testimony. (Doc. No. 1 at 15–16). For context, Smelley met with police after the first robbery to provide them with a description of the suspect. He gave an initial description to Officer Payne, and Officer Payne then relayed Smelley's description to crime scene investigator Claire Vondohlen. According to Officer Payne, Smelley described the armed suspect as a "six foot tall," 160-pound, "light-skinned" black male, "roughly around the age of 17 to 25, with dreads, [and a] camouflage bandana over his face." (Id. at 177). But Vondohlen testified that she heard from Officer Payne that the suspect was a "white male." (Crim. Doc. No. 289 at 198–99). Given that Breedlove is a light-skinned black male, he argues that his counsel should have done more to convince the jury

that Smelley had identified the suspect as a "white male." (Id.). He further argues that his lawyers' "lack of familiarity" with the case prevented them from objecting to Officer Payne's "false trial testimony" regarding Smelley's initial description of the suspect. (Doc. No. 1 at 16–17).

The Court need not decide whether counsel was deficient for failing to object to Smelley's or Officer Payne's testimony on these grounds because Breedlove has not established that such an objection would have resulted in his acquittal. Strickland, 466 U.S. at 697. Even if Smelly initially told Officer Payne that the suspect was a "white male," he later identified Breedlove as the robber in a photographic lineup and again in court at trial. It also appears that Breedlove's counsel understood the helpfulness of Vondohlen's testimony, because they used her reference to a "white male" to impeach the accuracy and validity of the photographic lineup. (See Crim. Doc. No. 290 at 216 ("If you've got an African-American suspect, you don't put a white person in there, for example?")). The Court does not find that the jury would have returned a different verdict if Breedlove's counsel had objected to Smelley's or Officer Payne's testimony.

Breedlove makes a similar argument about Teal's description to police. Teal initially described the second robber as someone who was a "little shorter" than 6'4" and was Puerto Rican or possibly Hispanic. (Id. at 72, 76). But Teal later testified on direct examination that the suspect could have been 5'8" tall. (Id. at 78). Breedlove argues that his counsel "failed to acknowledge" this discrepancy and should have emphasized Teal's initial description. (Doc. No. 1 at 15–16). The trial record does not support any deficient performance, however, because defense counsel cross-examined Teal on this exact issue:

Q. Okay. Now, initially you said that the individual -- I'm sorry -- you're six-four?

A. Yes, roughly.

Q. And you said that the individual was a little shorter than you?

A. Than myself.

Q. A little shorter than yourself?

A. Yes, sir.

Q. Right. What to you is a little shorter?

A. Roughly a few inches, maybe something similar to that.

Q. Okay. All right. And then in cross-examination, Mr. Wehby put some words in your mouth. He said that –

MR. WEHBY: Your Honor, object to the characterization.

THE COURT: Well, let's finish the question and then we'll see.

BY MR. SHOCKLEY: Q. He said the individual was five-eight, and you agreed to that?

A. I believe it was roughly around what I had said.

Q. Right. So what's the difference between six-four and five-eight? We're talking 8 inches, are we not?

A. Yes.

Q. So it doesn't exactly meet the description that you first gave?

A. Not entirely, no.

(Crim. Doc. No. 290 at 90–91). This targeted line of questioning clearly shows that defense counsel understood the facts and effectively cross-examined Teal on his eyewitness identification.

The Court also does not write on a blank slate with respect to this eyewitness identification testimony. In concluding that "[s]ufficient evidence supported Breedlove's convictions," the Sixth Circuit found as follows:

> Breedlove next challenges his Hobbs Act robbery and firearm convictions for both the September 2017 and October 2017 robberies, arguing that insufficient evidence supported his identification as the perpetrator. For the September 2017 incident, Breedlove argues that the robber's face was not visible on surveillance footage, [Smelley] saw only the robber's eyes and eyebrows for a few seconds, and Valcarcel-Arocho's testimony should be discounted due to the lack of corroborating evidence to support his testimony. As for the October 2017 incident, he similarly argues that again the robber's face was covered, the security guard

whom the robber shot only saw his eyes for a short period of time, and [Teal] was more focused on getting the money from the safe than on identifying the perpetrator. Again, however, we do not reassess the credibility of witnesses when evaluating the sufficiency of the evidence, and Valcarcel-Arocho's testimony that he and Breedlove conspired together to commit the robberies is sufficient to uphold his convictions. This testimony was corroborated by the eyewitness identifications, albeit imperfectly due to the robber's face covering, as well as the physical and cellphone evidence linking Valcarcel-Arocho with Breedlove and with Breedlove's recorded jail phone calls.

(Crim. Doc. No. 316 at 7). For these same reasons, the Court does not find that Breedlove can satisfy the prejudice prong of the Strickland test based on his counsel's alleged lack of familiarity with eyewitness identification issues.

>            b.    Counsel's Failure to Challenge Validity of Breedlove's Arrest Warrant

Next, Breedlove argues that his trial counsel were ineffective because they did not challenge the validity of his arrest warrant. (Doc. No. 1 at 16). He alleges that his arrest warrant did not satisfy the Fourth Amendment's particularity requirement because it merely identified the person to be seized as a "male suspect," (id. at 16), rather than list his name or provide a description by which he could be identified with reasonable certainty. See Rodriguez v. Wolbach, 499 F. Supp. 2d 479, 488–89 (S.D.N.Y. 2007) (citing Fed. R. Crim. P. 4(b)(1)(A)). Even if Breedlove were factually correct, however, this claim would not merit habeas relief because "[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction." United States v. Crews, 445 U.S. 463, 474 (1980); see also Mattox v. Davis, 549 F. Supp. 2d 877, 931 n.22 (W.D. Mich. 2008) (collecting cases and holding that "the power of a court to try a person is not impaired by any defect in the arrest warrant or the method of bringing the person before the court"); Fisher v. Genovese, 2020 WL 2193964, at *9 (M.D. Tenn. May 6, 2020) (holding that a challenge to the authenticity of an arrest warrant is "not cognizable on federal habeas review—particularly where, as here, the petitioner was ultimately tried upon the

indictment of the grand jury"); <u>Patterson v. Wilson</u>, 2007 WL 2407065, at *13 (N.D. Ohio Aug. 22, 2007) (holding "that even if a petitioner's arrest was unlawful, it would not bar his prosecution with lawfully admitted evidence"). Thus, Breedlove cannot satisfy the <u>Strickland</u> test based on his counsel's alleged failure to challenge his arrest warrant.

c.      Counsel's Failure to Object to the Warrantless Seizure of Cell Phone Location Data

Breedlove's final argument is that his lawyers should have objected to the Government obtaining cell phone location data without a search warrant. (Doc. No. 1 at 16). The Government quickly points out the irony in this argument because Breedlove maintains in his Motion that he never possessed the Mooneyhan phone. (<u>See</u> <u>id.</u> at 22 (arguing that the Government misstated evidence by telling the jury Breedlove "had possession" of the Mooneyhan phone)). If Breedlove denied "ownership, possession, control, [or] use" of the Mooneyhan phone to the "exclusion of others," then he would not have standing to challenge a warrantless search of that phone. <u>See</u> <u>United States v. Oakes</u>, 320 F. Supp. 3d 956, 961 (M.D. Tenn. 2018).

Even if Breedlove had standing, his challenge would also fail on the merits. On June 22, 2018, the Supreme Court in <u>Carpenter v. United States</u> clarified that police must obtain a warrant before they acquire cell-site location information. 585 U.S. 296, 316 (2018). The critical problem for Breedlove is that police obtained the cell phone location data in this case *before* the <u>Carpenter</u> decision. "[N]umerous circuit courts as well as district courts within the Sixth Circuit have held that the exclusionary rule [for warrantless searches] does not apply where law enforcement obtained [cell phone location data] without a warrant supported by probable cause prior to <u>Carpenter</u>, as law enforcement officers were acting in objectively reasonable good-faith on then-existing law." <u>United States v. Frei</u>, 2019 WL 189826, at *3 (M.D. Tenn. Jan. 14, 2019) (collecting

15

cases). Accordingly, Breedlove cannot show deficient performance or prejudice under Strickland based on his counsel's failure to object to the warrantless seizure of cell phone location data.

### 3. Counsel's Alleged Breach of Loyalty

Midway through trial on the morning of October 1, 2019, defense counsel alerted the Court outside the jury's presence that Breedlove wanted to enter an open plea of guilty. (Crim. Doc. No. 289 at 9–10). The Court then questioned Breedlove about whether his decision to plead guilty was knowing and voluntary. (Id. at 11–18). At the end of the Court's colloquy, Breedlove stated that he did *not* want to plead guilty, and the Court proceeded with the trial. (Id. at 18–19).

After the lunch break that day, Mr. Shockley explained to the Court that Breedlove "had difficulty" with pleading guilty earlier because there were "unknowns" about what his advisory guidelines would be. (Id. at 87–88). Ms. Sullivan added that Breedlove is "pleading and he's motivated by pleading guilty because he wants to accept responsibility. And he is guilty. That's why he wants to change his plea." (Id. at 87–88). The Court again paused the trial to question Breedlove about his decision to plead guilty. (Id. at 93–94). And again, Breedlove ultimately chose not to plead guilty and to proceed with trial. (Id. at 134).

Based on these events, Breedlove argues that Ms. Sullivan breached her "duty of loyalty" when she called him "guilty," and that her prejudicial statements altered the Court's perception of him and contributed to the denial of his motion for acquittal under Federal Rule of Criminal Procedure 29. (Doc. No. 1 at 17). Because a defendant's constitutional "right to counsel . . . extends to the plea-bargaining process," Lafler v. Cooper, 566 U.S. 156, 162 (2012), the Sixth Circuit has held that a defense attorney is ineffective if she does *not* inform that Court that the defendant wants to plead guilty. See Faison v. United States, 650 F. App'x 881, 887 (6th Cir. 2016). Thus, as an initial matter, it is unclear how Ms. Sullivan could have rendered deficient performance by merely fulfilling her duty to tell the Court that Breedlove wanted to plead guilty.

16

But even assuming Ms. Sullivan's conduct somehow fell below an objective standard of reasonableness, Breedlove's claim plainly fails on the prejudice prong of the Strickland test. To prove prejudice under these circumstances, Breedlove must show that the Court would have *granted* his Rule 29 motion after the close of the Government's proof if Ms. Sullivan had not told the Court he was guilty. Although Breedlove makes a conclusory argument that the result "could" have been "different" without Ms. Sullivan's statements, (Doc. No. 1 at 17), Breedlove cannot show prejudice here because the Court denied his Rule 29 motion for reasons that had nothing to do with the plea colloquies. As the Court explained on the record:

> I've certainly listened to all the evidence, and I think there's a lot of circumstantial evidence before the Court that the jury, depending on how much weight they give it, could find Mr. Breedlove guilty. There's the cell phone evidence, which is voluminous here, the blanket. Mr. Arocho's testimony has been corroborated in many ways, the eyewitness testifying, the jail calls. So it's really up to the jury to determine how much weight to give to all of that evidence. And the function of a Rule 29 motion for Mr. Breedlove's purposes is to construe the evidence in the light most favorable to the government, and the Court's done that. So I'm going to deny the motion to dismiss.

(Crim. Doc. No. 292 at 166). These statements demonstrate that the Court denied Breedlove's Rule 29 motion because it had no merit, not because Ms. Sullivan said he was guilty. His breach-of-loyalty argument therefore fails for lack of prejudice.

4. **Counsel's Failure to Object to Testimony and the Government's Closing Argument**

Breedlove next argues that his trial counsel rendered ineffective assistance by failing to object to certain issues that arose during trial. (Doc. No. 1 at 18–24). Specifically, he contends that his lawyers should have objected to Officer Payne's "false" testimony about Smelley's description of the first robber, and Smelley's and Bogard's unreliable identifications of Breedlove in the photographic lineup. (Id.). He further argues that his counsel should have objected to the Government's misconduct, which he describes as the Government's failure to produce "DNA or

forensics" evidence connecting Breedlove to the camouflage backpack found in Arocho's apartment; its suggestion that Breedlove possessed the Mooneyhan phone; its statements during closing argument that the camouflage backpack belonged to Breedlove based on its contents and the testimony from Arocho's girlfriend; and its statements during closing argument that Breedlove and Arocho communicated with each other leading up to the first robbery. (Id.).

As with many of his previous claims, Breedlove again fails to explain in detail why the jury would have acquitted him but for these alleged errors. Nor could he succeed in making that argument, because even if the Court sustained his proposed objections, the Sixth Circuit already concluded that there was "overwhelming corroborating evidence" of his guilt, such as Arocho's testimony "that they planned and conducted the robberies together and Breedlove's recorded phone calls from jail[.]" (Crim. Doc. No. 316 at 6). Although the Court could dispose of this claim for lack of prejudice under Strickland, it is worth emphasizing that "defense lawyers need not (and in fact should not) raise every colorable argument they can find." Moody v. United States, 958 F.3d 485, 492 (6th Cir. 2020) (citation omitted). Experienced trial lawyers instead understand that making "objections to each potentially objectionable event could actually act to their party's detriment" and draw attention to inculpatory information. Lundgren v. Mitchell, 440 F.3d 754, 774 (6th Cir. 2006). For these reasons, the Sixth Circuit has held that "any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the" prosecution. Id. "Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice." Id. at 774–75 (citing Hodge v. Hurley, 426 F.3d 368, 376 (6th Cir. 2005)).

Here, Breedlove's counsel did not render deficient performance by failing to object to Officer Payne, Smelley, and Bogard giving "false" eyewitness testimony. Whether their testimony was "false" is a credibility issue, not an admissibility issue, and the "credibility of eyewitness identifications" is a matter for the jury to decide based on the weight of the evidence. See United States v. Smithers, 212 F.3d 306, 315 (6th Cir. 2000); see also United States v. Sander, 404 F.3d 980, 986 (6th Cir. 2005) (holding that there is no ineffective assistance of counsel claim for failing to object to *admissible* evidence). "[A]ny weakness in eyewitness identification testimony ordinarily can be exposed through careful cross-examination of the eyewitnesses." United States v. Hall, 165 F.3d 1095, 1107 (7th Cir. 1999). The Sixth Circuit acknowledged that Breedlove's trial counsel acted reasonably in this regard because they were "able to cross-examine the identifying witnesses on issues such as Breedlove's face covering and the presence of a gun, and to cross-examine the investigating detective on factors touching on the accuracy of eyewitness identifications." (Crim. Doc. No. 316 at 6). Even more, "[r]eview of witness credibility is not within the province of this Court and is not proper under a § 2255 motion." Marcusse v. United States, 785 F. Supp. 2d 654, 665 (W.D. Mich. 2011) (citing 28 U.S.C. § 2255(a)).

Breedlove's remaining arguments about the camouflage backpack, the Mooneyhan phone, and his alleged communications with Arocho during the first robbery reflect his position that his lawyers should have objected to the Government's conduct during trial. (Doc. No. 1 at 21–24). "A failure to object to a prosecutor's comments . . . does not fall below an objective standard of reasonableness unless the comments constituted prosecutorial misconduct." Reed v. United States, 133 F. App'x 204, 208 (6th Cir. May 13, 2005). Accordingly, the Court will address these arguments in more detail below in its discussion of Breedlove's prosecutorial misconduct claim.

5. **Counsel's Alleged Failure to Adequately Cross-Examine Witnesses and Impeach Arocho**

Breedlove next argues that he received ineffective assistance of counsel because his lawyers did not cross-examine Smelley, Bogard, Arocho, Officer Payne, or several other Government investigators and detectives in a manner that he believes would have been more effective. (Doc. No. 1 at 24–33). The Court "should avoid second-guessing" in its "highly deferential" review of cross-examination questions and strategy. Bentley v. Motley, 248 F. App'x 713, 718 (6th Cir. 2007) (citing Strickland, 466 U.S. at 689). Indeed, the Sixth Circuit has held that unless counsel entirely fails to cross-examine a witness, the adequacy of a cross-examination is "virtually unchallengeable." Moss v. Hofbauer, 286 F.3d 851, 864 (6th Cir. 2002).

Here, there is nothing in the record to suggest that counsel altogether failed to cross-examine witnesses about key issues. In addition to cross-examining witnesses on relevant issues "touching on the accuracy of eyewitness identifications," (Crim. Doc. No. 316 at 6), Breedlove's counsel elicited testimony from Vondohlen that the suspect may have been a "white male. (Crim. Doc. No. 298 at 198). They then used this testimony to attack the accuracy of the photographic lineup. (See Crim. Doc. No. 290 at 216). Breedlove's lawyers also were not ineffective because they chose not to ask detectives about *why* they failed to check the camouflage backpack for fingerprints. (Doc. No. 1 at 27; see also Crim. Doc. No. 290 at 225–27). If his lawyers had cross-examined detectives about this issue, the detectives would have had an opportunity to explain why it was unnecessary or impossible to obtain fingerprints. Instead, as part of their trial strategy, defense counsel waited to raise this issue until closing argument. (See Crim. Doc. No. 293 at 34 ("You don't have fingerprints.")). Last, the Court finds that defense counsel's cross-examination of Arocho, which spans more than twenty pages of the trial transcript, was vigorous and constitutionally effective. (Crim. Doc. No. 292 at 8–32). As a result, Breedlove has not

20

demonstrated that his counsel's failure to ask his preferred questions during cross-examination means their conduct fell short of the norms of the legal profession. Having also failed to make any arguments about prejudice, Breedlove's claim does not satisfy either prong of the Strickland test.

### 6.    Counsel's Allegedly Inadequate Closing Argument

Breedlove further contends that his counsel gave a constitutionally defective closing argument because she did not mention certain exculpatory facts. (Doc. No. 1 at 33–37). "The right to effective assistance extends to closing arguments." Yarborough v. Gentry, 540 U.S. 1, 5 (2003). "Nevertheless, counsel has wide latitude in deciding how best to represent a client, and the habeas court must give deference to counsel's tactical decision in [her] closing argument because of the broad range of legitimate defense strategy at that stage." Denham v. Rivard, 2017 WL 11815414, at *2 (6th Cir. June 9, 2017) (citing Yarborough, 540 U.S. at 5–6) (internal quotation marks omitted). "Judicial review of a defense attorney's summation is therefore highly deferential—and doubly deferential when it is conducted through the lens of federal habeas." Yarborough, 540 U.S. at 5.

The record reflects that defense counsel did, in fact, discuss several "key facts" that Breedlove argues she should have mentioned. For example, he contends she should have argued that Detective High merely accepted other detectives' theory of the case without conducting any due diligence of his own, (Crim. Doc. Nos. 1 at 33; 291 at 70), yet counsel addressed this exact issue during her closing argument. (Crim. Doc. No. 293 at 22) ("I think the most disturbing thing that I heard during the trial was during Detective Chad High's testimony" when he said "I'm not going to second-guess the detective's framework[.]"). It is also unclear what Breedlove means when he says his counsel failed to "declare" Arocho's trial testimony unreliable, (Doc. No. 1 at 33), particularly because she mentioned several times during closing that Arocho was a cooperating witness who switched his story to receive a more lenient sentence. (Crim. Doc. No.

293 at 38–39; see also id. at 34 ("And I think if you go down the list and cross everything off, the only thing you have left is Arocho's testimony and it's just not believable without checking your pocket on that guy."). Breedlove further argues that his counsel should have mentioned Arocho's "obvious motives to implicate Breedlove" by planting the backpack and other evidence in his apartment, (Doc. No. 1 at 34), but she in fact argued that Arocho's story "about what happened with the backpack" was "just not credible." (Crim. Doc. No. 293 at 33–34).

Nevertheless, even if defense counsel failed to make each of the points that Breedlove contends she should have made in closing argument, that does not mean he received ineffective assistance of counsel. Lawyers are allowed to make strategic decisions about which arguments to make during closing within the time allotted, and they may decide to focus on certain aspects of the record and remain silent on others. There are many reasons why defense counsel may choose to emphasize certain testimony and remain silent about other evidence. What matters is that Breedlove has not shown that "but for" a more detailed closing argument, there was a reasonable probability that the jury would have acquitted him on one or more charges. See Trujillo v. Plough, 475 F. App'x 261, 270–71 (10th Cir. 2012) (denying claim on prejudice prong even though counsel waived closing argument).

### 7. Counsel's Alleged Failure to Present Mitigation Evidence at Sentencing

Breedlove argues that his lawyers were also ineffective *after* trial because they did not ask the Court to continue the sentencing hearing to evaluate additional mitigation factors. (Doc. No. 1 at 17–18). He contends his lawyer said she was "too busy" to seek a continuance to obtain a report that connected his childhood abuse to his "current ptsd and violent acts." (Id. at 37). To satisfy Strickland, Breedlove must show that he would have received a lower sentence if his counsel asked for a continuance to present an additional report connecting his childhood abuse to his offense conduct. He has not made that showing here.

22

As the Sixth Circuit summarized, the Court heard testimony from Breedlove's "brother at sentencing that as a child Breedlove was neglected and sexually abused by his mother and her boyfriend." (Crim. Doc. No. 316 at 8). The Court also gave significant weight to other mitigating evidence that defense counsel presented at the sentencing hearing, including a letter from Dr. Julie Gallagher and a video from members of his family. (See Crim. Doc. No. 294 at 21–22). It "heard this testimony about Breedlove's traumatic childhood and acknowledged the negative impact it had on him, but it determined that a within guidelines sentence was nonetheless appropriate." (Id.). And the Court did so after it considered, but ultimately denied, Breedlove's motion for a downward departure or variance based on his overstated criminal history. (Id. at 44–47).

At bottom, the Sixth Circuit agreed that the Court properly "considered the nature and circumstance of the offenses, in particular the fact that [Breedlove] shot an unarmed security guard during one of the robberies, his criminal history of multiple burglaries and another robbery involving a shooting, and the need to promote respect for the law, provide deterrence, and protect the public." (Id.). The Court maintains that Breedlove's sentence was sufficient but not greater than necessary, and there is no reason to believe that the Court would have entertained a continuance based on vague allegations that another "report" could contain *additional* mitigating evidence about Breedlove's childhood abuse. This claim, too, fails to satisfy the prejudice prong of the Strickland test.

*     *     *

In sum, Breedlove has not shown that his lawyers', William Shockley and Meggan Sullivan, conduct at trial or sentencing "so undermined the proper functioning of the adversarial process such that [it] cannot be relied on as having produced a just result." Strickland, 466 U.S.

at 686.   Without a showing of deficient performance *and* prejudice, Breedlove's myriad ineffective-assistance-of-counsel claims fail.

B.    Prosecutorial Misconduct

Breedlove moves to vacate his conviction and sentence on grounds that the Government engaged in unconstitutional prosecutorial misconduct by making, or soliciting from witnesses, "a variety of misleading statements known to be false."  (Doc. No. 1 at 38–40).  The Sixth Circuit "has adopted a two-step approach for determining whether prosecutorial misconduct violates a defendant's due process rights" and warrants habeas relief.  Macias v. Makowski, 291 F.3d 447, 451–52 (6th Cir. 2002) (citation omitted).  First, the Court "must consider whether the prosecutor's conduct and remarks were improper."  Id. at 452 (citation omitted).  Second, if the prosecutor acted improperly, then the Court must determine whether the impropriety was "flagrant" because it "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Id. at 451–52 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  To determine whether improper conduct is "flagrant," the Court considers the following four factors:  "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." Id. (citation omitted).

Most of Breedlove's arguments fail under the first step because they do not reflect any improper statements or conduct by prosecutors.  For example, Breedlove claims the Government deliberately falsified the nature of the "motel receipt" found in the camouflage backpack at Arocho's apartment by describing it as "paperwork identifying [Breedlove] as the owner of that backpack."  (Crim. Doc. No. 288 at 22–23, 25).  Prosecutors are allowed "to argue reasonable inferences from the evidence" during closing argument, and the existence of the motel receipt and

the backpack were facts in evidence. <u>Macias</u>, 291 F.3d at 452 (citation omitted); <u>see also</u> (Crim. Doc. No. 290 at 187–88). The Court does not find anything "improper" about prosecutors asking jurors to infer that Breedlove owned the backpack if it contained a motel receipt (i.e. "paperwork") with his name on it. Moreover, this statement was superfluous because defense counsel agreed during her closing argument that Breedlove owned the backpack. (Crim. Doc. No. 293 at 33).

Breedlove also accuses the Government of misleading the jury when it said the testimony of "Dianna Jones" (Arocho's girlfriend) "squarely places the defendant in possession of the backpack and the items inside that backpack, including that distinctive blanket." (Doc. No. 1 at 39). Although Jones and Arocho testified that they never saw Breedlove with the *blanket*, Jones testified that she resided with Arocho, that Breedlove would often bring his backpack with him when he stayed at their apartment, and that she "never touched" the backpack. (<u>See</u> Crim. Doc. No. 291 at 155, 228). Based on this testimony, prosecutors asked jurors to make the reasonable inference that if Breedlove possessed the backpack, he also possessed everything inside it. There was nothing "improper" about fairly and accurately summarizing Jones' testimony in this manner.

Breedlove next claims that the Government committed misconduct by not admitting Officer Payne's police report or otherwise correcting her "false" testimony about Smelley's initial suspect description. (Doc. No. 1 at 38). This argument fails for two main reasons. First, the Government likely would not have been able to admit the police report to impeach its own witness, and "[s]tatements made by victims in a police report are hearsay and are not admissible at trial to prove the truth of the matter asserted." <u>Lauderdale v. Wells Fargo Home Mortg.</u>, 552 F. App'x 566, 571 (6th Cir. 2014). Second, a "false-testimony claim is cognizable in habeas" only if the petitioner can "show (1) that the prosecution presented false testimony (2) that the prosecution knew was false, and (3) that was material." <u>Akrawi v. Booker</u>, 572 F.3d 252, 265 (6th Cir. 2009)

(citations and internal quotation marks omitted).  Breedlove may disagree with Officer Payne's testimony, but his argument fails because he has not shown that her recollection of Smelley's description was "indisputably false" or that the Government knew it was false.  See id. ("The subject statement must be indisputably false rather than merely misleading."); see also Coe v. Bell, 161 F.3d 320, 343 (6th Cir. 1998).

The Court applies the same analysis to Breedlove's argument that the Government "made no effort to correct Arocho's various untruthful, [in]accurate and inconsistent statements."  (Doc. No. 1 at 39–40).  Aside from this conclusory argument, Breedlove does not identify a single statement from Arocho's testimony that the Government knew was "indisputably false."  He therefore fails to show how the Government improperly admitted false testimony from Arocho.

Breedlove further contends that the Government misstated evidence when it said that the Mooneyhan phone belonged to him.  (Id. at 39).  The Court disagrees because the Government carefully distinguished the "Lil D" phone (which belonged to Breedlove) from the "Mooneyhan" phone (which belonged to Mooneyhan, but which Breedlove used for the second robbery).  (See, e.g., Crim. Doc. No. 292 at 118, 123, 149).  To the extent the Government ever misspoke and said that Breedlove *owned*, rather than *possessed*, the Mooneyhan phone, that comment would not rise to the level of "flagrant" misconduct to support a due process violation.

Breedlove's final argument is that the Government lied during its opening statement when it told the jury they would see "communications on September 13th" (i.e. hours before the first robbery) between Arocho's phone and the "Lil D" phone.  (Crim. Doc. No. 292 at 145–46).  This statement was consistent with Detective Sutherland's testimony that "Arocho and Mr. Breedlove spoke for a total of about three minutes leading up to the September robbery."  (Id.).  It was also consistent with Arocho's statement that he and Breedlove communicated about the first robbery

"two nights before or . . . the night before" it happened. (Crim. Doc. No. 291 at 260). Nevertheless, even if the Government somehow made a false promise in its opening statement about these communications, the Court instructed the jury that "[t]he lawyers' statements and arguments are not evidence" that they may consider in determining Breedlove's guilt. (Crim. Doc. No. 293 at 57); see also United States v. Hall, 979 F.3d 1107, 1120 (6th Cir. 2020) ("[G]eneral curative instructions, given during final jury instructions, may suffice to clear up any prejudice."). The Cout therefore cannot conclude that the Government made any "flagrant" comments warranting habeas relief.

      C.      Ineffective Assistance of Appellate Counsel

Breedlove next argues that he received ineffective assistance of *appellate* counsel because his appellate attorney failed "to raise arguable issues" on appeal. (Doc. No. 1 at 5, 37–38). Those "arguable issues" include his claims of ineffective assistance of trial counsel and prosecutorial misconduct that the Court already addressed above. The Sixth Circuit has held that if the petitioner's "trial counsel were not ineffective, then his appellate counsel cannot have been ineffective for failing to raise the claim that trial counsel were ineffective." Mahdi v. Bagley, 522 F.3d 631, 635 (6th Cir. 2008); see also Jones v. United States, 2009 WL 5170191, at *12 (M.D. Tenn. Dec. 18, 2009). Similarly, appellate counsel cannot have been ineffective for failing to raise claims about "a prosecutor's comments" unless those "comments constituted prosecutorial misconduct." Reed v. United States, 133 F. App'x 204, 208 (6th Cir. 2005) (citations omitted). Because Breedlove's trial lawyers were not constitutionally defective, and the Government did not engage in prosecutorial misconduct, Breedlove's appellate counsel was not ineffective for failing to raise these frivolous arguments on appeal.

D.     Validity of Section 924(c) Convictions

Breedlove further contends that his § 924(c) convictions in Counts Three and Five (and his resulting mandatory minimum consecutive sentences) are invalid because Hobbs Act robbery and conspiracy to commit Hobbs Act robbery do not qualify as crimes of violence under § 924(c). (Doc. No. 1 at 40).  Section 924(c) makes it illegal to use, carry, brandish, or discharge a firearm "during and in relation to any crime of violence."  18 U.S.C. § 924(c)(1)(A).  The underlying "crime of violence" in Count Three was the Hobbs Act robbery charged in Count Two, and the underlying "crime of violence" in Count Five was the Hobbs Act robbery charged in Count Four. (See Crim. Doc. No. 51).  The Supreme Court in United States v. Davis held that a predicate offense qualifies as a "crime of violence" if it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  588 U.S. 445, 449, 470 (2009) (citing 18 U.S.C. § 924(c)(3)).  It is well settled in the Sixth Circuit that "Hobbs Act robbery constitutes a crime of violence" under this definition.  United States v. Gooch, 850 F.3d 285, 292 (6th Cir. 2017); United States v. Richardson, 948 F.3d 733, 741 (6th Cir. 2020). Breedlove's argument therefore fails under binding Sixth Circuit precedent because his convictions for Hobbs Act robbery in Counts Two and Four qualify as crimes of violence to support his § 924(c) convictions in Counts Three and Five.  Accordingly, the Court will not vacate Breedlove's § 924(c) convictions  on these grounds.[4]

---

[4] Breedlove filed an "Addendum" that vaguely discusses the Southern District of Florida's decision in United States v. Louis, No. 21-cr-20252, 2023 WL 2240544 (S.D. Fla. Feb. 27, 2023).  (See Doc. No. 7).  As the Eleventh Circuit has explained, the "two-page unpublished district court order in" Louis granted "a post-trial motion to arrest judgment and dismiss[ed] numerous § 924(c) counts, under Federal Rule of Criminal Procedure 34 for lack of jurisdiction."  United States v. Natson, 2024 WL 1829096, at *4 n.5 (11th Cir. Apr. 26, 2024) (citing Louis, 2023 WL 2240544, at *1–2)).  It is unclear how Louis helps or even applies to Breedlove's case.  Even more, the Eleventh Circuit emphatically rejected Louis as being "entirely conclusory" and "find[ing] no support in the law."  Natson, 2024 WL 1829096, at *4 n.5.  Accordingly, it does not appear that Breedlove is entitled to any habeas relief based on Louis.

E.       Post-Sentencing Rehabilitation

Breedlove also argues that he is entitled to "relief" under § 2255 because his post-sentencing rehabilitation "is considerably exemplary." (Doc. No. 1 at 41–47). He later filed a "Motion of Addendum" to provide additional "evidence" of his rehabilitation. (See Doc. No. 7). The Court certainly appreciates any efforts Breedlove has taken to better himself while in custody, but his argument is misplaced because post-sentencing rehabilitation is not a cognizable basis for the Court to grant relief under § 2255. See, e.g., United States v. Bundy, 198 F.3d 247 (6th Cir. 1999) (Table) (holding that "[a]lthough we commend Bundy for his rehabilitative efforts and accomplishments since his conviction," § 2255 does not "permit[] the sentencing court to reopen Bundy's sentencing for the relief he seeks"); United States v. Lloyd, 484 F. Supp. 2d 1232, 1240 n.12 (S.D. Ala. 2007) (collecting cases and holding that the court "is unaware of a single authority" that has granted § 2255 relief based on a petitioner's "rehabilitative endeavors that postdate his original sentencing"); United States v. Johnson, 2023 WL 4707853, at *6 (E.D.N.Y. July 24, 2023) (holding that even if petitioner "can be said to be nothing other than a model inmate, . . . rehabilitation is not a cognizable basis for relief under § 2255"); United States v. Renfro, 2017 WL 1416869, at *6 (E.D. Ky. Mar. 22, 2017) ("A request for a reduction in a sentence because of post-sentence rehabilitation is not a claim presenting a sentencing issue that is constitutional in nature" or "cognizable in a § 2255 proceeding absent a showing of a complete miscarriage of justice[.]").

F.       Mandatory Consecutive Sentences for § 924(c) Convictions

Breedlove's next alleged ground for relief is that the Court committed "reversible error" when it "mistakenly believed it must impose consecutive" sentences for his convictions. (Doc. No. 11 at 1–2). Breedlove relies heavily on the Sixth Circuit's decision in United States v. Lanier, which found that the district court committed reversible error when it stated that the *guidelines* required it to impose consecutive sentences for defendant's three convictions for *conspiracy to*

29

*commit Hobbs Act robbery*.  2023 WL 4963190, at *5–6 (6th Cir. Aug. 3, 2023).  <u>Lanier</u> is readily distinguishable, however, because it did not involve *statutory* mandatory minimum sentences or *§ 924(c)* convictions.  Here, the Court acknowledged at sentencing that the § 924(c) conviction in Count Three carries "a mandatory minimum of imprisonment for ten years, consecutive to all other counts," and the § 924(c) conviction in Count Five carries "a mandatory minimum term of imprisonment for seven years, consecutive to all other counts."  (Crim. Doc. No. 294 at 35).  Breedlove's two § 924(c) convictions therefore required the Court to impose "the *statutorily mandated*" minimum term of imprisonment of 17 years (or 204 months) consecutive to all other counts.  (<u>Id.</u> at 40, 42–43 (emphases added)).  The Court again clarified in the Judgment that the multiple 151-month sentences imposed on Counts One, Two, and Four would run "concurrent with each other," and consecutive to the mandatory minimum combined sentences of 204 months on Counts Three and Five.  (Crim. Doc. No. 270 at 3).  The Court's straightforward application of the law does not constitute reversible error.

G.      Remaining Undeveloped Arguments in Breedlove's § 2255 Form

In line item 14 of the standard § 2255 form instructing the movant to list "any ground in this motion that you have <u>not</u> previously presented in some federal court . . . and state your reasons for not presenting them," Breedlove wrote: "Exculpatory scientific evidence, newly discovered evidence."  (Doc. No. 1 at 10).  Other than this single sentence on the § 2255 form, however, Breedlove does not provide any factual support, legal support, or further explanation about what scientific evidence or new evidence he is referring to.  It is well-settled in the Sixth Circuit that "conclusory allegations alone, without supporting factual averments, are insufficient to state a valid claim under § 2255."  <u>Jefferson v. United States</u>, 730 F.3d 537, 547 (6th Cir. 2013)).  Even under the liberal rules of construction applied to pro se filings, the Court cannot glean any supporting factual averments for Breedlove's statement about new evidence.  The Court therefore

declines to entertain this undeveloped argument.  See McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1989) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Breedlove is not entitled to habeas relief based on the claims raised in his Motion.  Breedlove's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 (Doc. No. 1) will therefore be denied, and his original 355-month sentence will remain in place.

When the district court denies a ground for relief on the merits in a § 2255 action, the Court must also issue or deny a certificate of appealability ("COA").  See Rule 11(a), Rules Gov'g § 2255 Cases.  A § 2255 petitioner "may not" appeal a district court's denial of habeas relief without the issuance of a COA.  28 U.S.C. § 2253(c)(1)(B); see also Fed. R. App. P. 22(b)(1).  The Court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A § 2255 petitioner "seeking a COA must prove 'something more than the absence of frivolity' or the existence of mere 'good faith' on his or her part."  Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (citing Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).  Instead, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Id. (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

After thoroughly reviewing each of Breedlove's claims, including his ineffective-assistance-of-trial-counsel claims, his claims of prosecutorial misconduct, his ineffective-assistance-of-appellate-counsel claim, his claims about the validity of his § 924(c) convictions, his claims about post-sentencing rehabilitation, and his claims related to sentencing, the Court will

31

deny a COA on each of his claims because reasonable jurists would not find debatable or wrong the Court's rejection of his arguments.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE